UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIANE HARB,

    Plaintiff,

v.

MICHIGAN BELL TELEPHONE CO.,

    Defendant.
                                       /

Case No. 06-11777

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

Pending before this Court is Defendant Michigan Bell Telephone Company's motion for summary judgment, filed on January 17, 2007. Plaintiff Christiane Harb's case arises out of the fact that she suffers from diabetes, vertigo and depression that affected her ability to perform her job with Defendant. Plaintiff alleges that Defendant's treatment of her during her employment and the eventual termination violated both federal and Michigan state law, and brings several claims: (1) unlawful discrimination, failure to accommodate and retaliation under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12117, *et seq.*, (2) unlawful discrimination and retaliation under the Michigan Persons with Disabilities Civil Rights Act (the "MDCRA"),[1] Mich. Comp. Laws § 37.1101, *et seq.*, and (3) unlawful retaliation under the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. § 2601, *et seq.*

---

[1] Prior opinions of some courts refer to this statute as the Handicappers' Civil Rights Act, or HCRA.

1

In support of its motion for summary judgment, Defendant argues that Plaintiff has failed to state a valid claim under any of these statutes. Defendant asserts that her ADA and MDCRA claims fail because (1) Plaintiff has not shown that she meets the threshold requirement of being disabled since there is no evidence that her medical conditions substantially limit a major life activity, and (2) she has not demonstrated a causal connection between her complaint to the Michigan Department of Civil Rights and the eventual termination. Defendant argues that Plaintiff's FMLA retaliation claim fails because she has not met the initial burden of stating a prima facie case under the statute due to (1) not being entitled to further FMLA leave at the time of her termination, so she was not engaged in a protected activity, and (2) an inability to show a causal connection between the exercise of FMLA leave and her termination. Even if Plaintiff has raised a prima facie case, Defendant alternatively argues that she has not raised evidence to suggest that Defendant's legitimate, non-discriminatory justification, that it terminated Plaintiff because she failed to return to work once her approved leave concluded, was pretext for unlawful retaliation.

Plaintiff responds that she has met the burden of pleading a prima facie case under all three statutes. For the reasons set forth below, the Court GRANTS Defendant's motion for summary judgment and this case is DISMISSED.

## I. FACTS

Plaintiff began employment with Defendant on February 26, 2001 as a Service Representative in its Enhanced Business Center ("EBC") focusing on assisting business customers with phone and DSL accounts. (Def.'s Mot. for Summ. J. (hereinafter, "Def.'s Mot.") at 2; Pl.'s Resp. at 1.) In the early part of 2003, Defendant closed the EBC

department and transferred all of its employees, including Plaintiff, to its Customer Care Center ("CCC") where she still sold DSL lines, but was now dealing with residential customers rather than businesses. (Def.'s Mot. at 2.)

Seventeen years ago, Plaintiff was diagnosed with vertigo and diabetes. Vertigo is a condition that leads to dizziness and the sensation of "spinning or moving . . . like being on a roller coaster, [which Plaintiff describes as] causing her at times to be debilitated and immobilized." (Pl.'s Resp. at 1.) Plaintiff is unable to perform her job duties until an attack has passed. (Harb Dep., Pl.'s Resp., Ex. 1 at 53.) Following the onset of a vertigo attack, the only remedy is for Plaintiff to "take her medication and wait it out." (*Id.* at 2.) Such attacks can last anywhere from several minutes to over an hour, but Plaintiff has no way of predicting when such an attack will occur. Plaintiff states that her former managers in the EBC department would give her time following a vertigo attack to see if the symptoms would subside prior to sending her home for the day, but that her new CCC department supervisors would immediately pull her off the shift and force Plaintiff to use FMLA time to cover the lost work hours. (*Id.* at 3.)

Plaintiff's diabetes did not have a major effect on her ability to perform her specific job duties, but upon her physician prescribing a water pill to help regulate her glucose levels around April 2004, Plaintiff needed to use the restroom four to five additional times during the workday. (Def.'s Mot. at 3.) Under the collective bargaining agreement covering Plaintiff's employment, each worker was entitled to two 15-minute breaks during their shift. Rather than allow Plaintiff to take additional breaks during the day, a supervisor stated that she should simply split up the two allotted breaks into shorter periods throughout the day to cover the time when Plaintiff needed to use the restroom.

3

(Pl.'s Resp. at 3.)  Plaintiff claims that other CCC department employees with medical conditions were given additional breaks to accommodate their needs, however.  (*Id.* at 2-3.)  On May 13, 2004, Plaintiff filed a complaint with the Michigan Department of Civil Rights (the "MDCR") alleging that Defendant's policies of splitting up breaks and forcing her to take FMLA leave when she could not finish the day violated the MDCRA, but that agency declined to file a formal complaint based upon Plaintiff's allegations.[2]  (Def.'s Mot. at 5.)

On July 15, 2004, Plaintiff was admitted to Kingswood Hospital for psychiatric treatment related to depression that manifested itself in suicidal and homicidal thoughts.  She was released for continuing outpatient care six weeks later at the end of August.  (Pl.'s Resp. at 3-4.)  In connection with this hospitalization, Defendant approved Plaintiff's short-term disability leave of absence until September 7, 2004, with a return to work date of September 8.  Prior to the expiration of this leave, Plaintiff submitted additional medical documents and Defendant extended the return date to October 19, 2004.  (*Id.* at 4.)  Despite the fact that Plaintiff did not return to work as scheduled on October 19, and waited until October 21 to submit medical records to support a longer leave period, Defendant extended Plaintiff's return date to November 2, 2004 without taking any adverse employment action.  Finally, Defendant extended Plaintiff's leave one more time, with a final return date of December 8, 2004, even though she again

---

[2]At some point during this time, Plaintiff also began using a heart monitor that gathered data about her heartbeat and required that she transmit the data to her doctor via telephone during the day.  (Pl.'s Resp. at 3; Def.'s Mot. at 5-6.)  Although Plaintiff claims that her supervisors harassed her for needing to use work time for this task, she only used the monitor for two days and her brief focuses more on Defendant's other allegedly wrongful actions, so this issue does not seem to be particularly material here.

failed to return to work by the previous deadline or submit additional medical documents prior to that date.[3]  (Pl.'s Resp. at 4-5; Def.'s Mot. at 6-8.)  On several occasions, Plaintiff's documentation supporting these extensions of her leave also requested that she be moved from the CCC department, due to the stress that the relationship with her supervisors caused.

As the final return to work deadline in early December approached, one of Plaintiff's physicians submitted a letter requesting that her leave be extended to at least January 1, 2005 due to personal family issues.  (Pl.'s Resp., Ex. 24.)  Following a review of Plaintiff's file, which included the most recent medical information, one of Defendant's internal physicians determined that she was no longer disabled and could perform the tasks of her position.  Thus, Defendant notified Plaintiff on December 6, 2004 that her leave of absence would no longer be extended, barring any new medical documentation being provided.  (Def.'s Mot. at 8-9; Pl.'s Resp. at 5-6.)  When Plaintiff did not arrive at work as scheduled on December 8, Defendant sent her a letter indicating that it viewed this as a voluntary resignation.  (Pl.'s Resp., Ex. 28.)  Then, on December 21, Defendant again wrote Plaintiff to inform her that it considered her employment separated as of December 10.  (*Id.*, Ex. 29.)

---

[3]As the end of each leave period neared, Defendant sent Plaintiff at least one letter informing her of the current return date and the fact that failure to report for work on the scheduled day would result in Defendant considering this as a voluntary resignation.  Plaintiff notes that many of these letters were sent to her former address, yet she does not argue that somehow this precluded her from knowing when each leave period was set to end.  Furthermore, Plaintiff admits that she spoke with someone in Defendant's department that handles medical leaves on December 6, 2004, so she was undoubtedly aware of the expiration of her final leave period at the time period relevant to this case.

## II. STANDARD OF REVIEW – MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. ANALYSIS

### A. Plaintiff's ADA and MDCRA Claims

Plaintiff's first two claims allege violations of the ADA and MDCRA for discrimination against Plaintiff because of her disabilities, failure to accommodate these disabilities, and retaliation against her for filing a complaint with the MDCR.

1. **Plaintiff's disabilities**

The analysis for claims under both of these statues is essentially the same, as Michigan courts use federal law under the ADA as an aid to interpret the MDCRA. *Stevens v. Inland Waters, Inc.*, 559 N.W.2d 61, 64 (Mich. Ct. App. 1996). As a threshold issue, a plaintiff claiming that an employer violated the ADA or MDCRA must show that they were disabled before even reaching the prima facie elements of the claim. *Huge v. General Motors Corp*, 62 F. App'x 77, 79 (6th Cir. 2003).

Under the ADA, "[t]he term 'disability' means, with respect to an individual–(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual . . . ." 42 U.S.C. § 12102(2). ADA regulations have interpreted a major life activity to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). In order to substantially limit a major life activity, a plaintiff's disability must leave them

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restrict[ the person] as to the condition, manner or duration under which [they] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). When a plaintiff asserts that the major life activity which their disability impacts is the ability to work, the person must be "significantly restricted in the

7

ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities" in order for the disability to substantially limit that activity. 29 C.F.R. § 1630.2(j)(3)(i). Furthermore, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* "The impairment's impact must also be permanent or long term." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002). Lastly, courts must strictly interpret the ADA's terms "to create a demanding standard for qualifying as disabled" under the statute. *Id.* at 197.[4]

Plaintiff claims that she is disabled as a result of three conditions: (1) diabetes, (2) depression, which led to her medical leave of absence from July 2004 through December 2004, and (3) vertigo, which rendered Plaintiff unable to perform the tasks of her position with Defendant when an attack occurred.

With regards to Plaintiff's diabetes, the only effect that she mentions is the fact that the water pill her physician prescribed forced her to use the restroom four to five more times than normal during the workday. Such a situation is far from one that substantially limits Plaintiff's major life activities and is not a disability under the ADA. In addition, her brief on this section contains no discussion whatsoever of how Plaintiff's diabetes substantially limits her major life activities, (Pl.'s Resp. at 8) so this condition is not a proper candidate for a disability as required by the ADA.

---

[4]Michigan courts concur in interpreting the MDCRA, as "the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment." *Chmielewski v. Xermac, Inc.*, 550 N.W.2d 797, 801 (Mich. Ct. App. 1996).

Next, Plaintiff claims that her depression "affects, among other things, her walking, driving, sleeping, eating and caring for herself and for her son." (Pl.'s Resp. at 8.) While Plaintiff's medical leave of absence from work was related to this condition, as of November 30, 2004, Plaintiff's physician cleared her to return to work "at the beginning of the New Year." (Pl.'s Resp., Ex. 24.) Still, the proper focus is on whether Plaintiff was disabled at the time that Defendant terminated her, so the fact that her depression was not necessarily permanent is not dispositive. Based upon Plaintiff's claims and her physician's testimony, the Court is satisfied that she has properly raised a disputed item of material fact regarding whether she was disabled under the ADA at the time of her termination, and it is therefore proper to consider the merits of her claim for unlawful termination on the basis of her depression.

In terms of the vertigo condition, it is undisputed that when Plaintiff suffered such an attack she was unable to continue working until the symptoms passed. Unless the attack subsided quickly, Plaintiff would then take the remainder of the day off as FMLA leave because she was unable to work. Plaintiff has experienced vertigo for the better part of two decades, and her allegations are sufficient for a reasonable fact finder to conclude that her vertigo attacks significantly restrict her from performing certain tasks due to the fact that such episodes leave her debilitated and unable to do anything except wait for the dizziness to pass. (Harb Dep. at 49.) Thus, the remaining question is whether vertigo affects Plaintiff's major life activities.

Plaintiff claims that the vertigo "substantially limits, among other things, her walking, standing, sitting, working, sleeping, driving, thinking and concentrating." (Pl.'s Resp. at 8.) Plaintiff admits, however, that these activities are only limited during the

9

time when she is actually experiencing a vertigo attack. The exact time of an attack can vary from a few minutes to several hours,[5] but it is unclear how frequently Plaintiff has vertigo attacks. During her employment with Defendant, Plaintiff cannot recall the frequency of the attacks, except to say that they occurred "often." (Harb Dep. at 48.) That said, Plaintiff experienced a total of six vertigo attacks during the first eleven months at her most recent job prior to her deposition in this case. Two of these occurred while she was at work and passed within approximately one hour, after which she was able to continue working, while the other four occurred outside of work. (*Id.* at 12-13.) These latter four episodes forced her to miss one day of work each time.

At least one court has held that a plaintiff claiming that vertigo affected his ability to work was not disabled because of the infrequent nature of his attacks. *See Perkins v. St. Louis County Water Co.*, 160 F.3d 446, 448 (8th Cir. 1998) (holding that a plaintiff who missed a total of two-and-a-half weeks of work over a three-year period because of two attacks was not disabled under the ADA). Admittedly, Plaintiff has experienced more such attacks than the plaintiff in *Perkins*, but the cumulative period of days that Plaintiff has missed from work as a result of her vertigo appears to be relatively small. Without a more definite estimate of how frequently Plaintiff was experiencing vertigo attacks than "often," the Court is doubtful that this condition constitutes a disability for purposes of the ADA, particularly in light of the Supreme Court's directive that the terms of the Act be "strictly interpreted." *Toyota*, 534 U.S. at 197. That said, the Court is mindful of the standard which applies for purposes of addressing the instant motion for

---

[5]Plaintiff even reports one attack prior to the time period at issue in this case that lasted three straight weeks. (Harb Dep. at 55.)

summary judgment and is willing to assume, for sake of argument, that Plaintiff's vertigo is a qualifying disability under the ADA.

The Court thus proceeds to consider the substance of Plaintiff's claims under the ADA and MDCPA related to her depression and vertigo.

### 2. Plaintiff's disability discrimination claim fails as a matter of law

Plaintiff first claims that Defendant unlawfully discriminated against her by terminating her as a result of her depression and associated leave. In order to state a prima facie claim for disability discrimination under the ADA, Plaintiff must show that: "(1) [s]he is an individual with a disability; (2) [s]he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodations; and (3) [s]he was discharged solely by reason of [her] handicap." *Williams v. London Utility Comm'n*, 375 F.3d 424, 428 (6th Cir. 2004) (quoting *Cotter v. Ajilon Servs.*, 287 F.3d 593, 598 (6th Cir. 2002)). Once the plaintiff has made this showing, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory justification for the adverse employment action under the familiar *McDonnell Douglas* burden-shifting analysis. If the defendant does this, the burden shifts back to the plaintiff to show that the reason asserted is mere pretext for unlawful retaliation. *Id.*

Assuming that Plaintiff stated a valid prima facie case of ADA discrimination, Defendant has stated a legitimate justification for her termination. Namely, that she did not return to work on the scheduled date once her approved disability leave related to the depression was over. Therefore, it is up to Plaintiff to rebut Defendant's legitimate justification with sufficient evidence of pretext to create a disputed issue of material fact.

A plaintiff placed under such a burden can show evidence of pretext in one of

11

three ways: "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996). Plaintiff does not dispute that she did not return to work as required on December 8, nor does she assert that Defendant was not justified in terminating her as a result of this failure on her part. Thus, Plaintiff has not argued under the first or third grounds for showing pretext, so her argument must be that other reasons motivated Defendant's discharge decision.

Plaintiff raises a number of items in an attempt to meet this burden, including that this action was in violation of Defendant's policies, Defendant did not contact Plaintiff's physicians to obtain medical documents, denied her disability claim without performing a psychological evaluation, refused to consider reasonable accommodations, and did not send Plaintiff a disability denial letter until December 30, 2004. Plaintiff, however, does not show that Defendant was required to take these actions, and the fact remains that Defendant's decision to refuse Plaintiff additional disability leave was based, at least in part, upon its own physician's determination that Plaintiff was no longer disabled and could return to work. It is true that Plaintiff's physician determined that she should not return to work due to depression-related issues until almost a month later, but this alone does not suggest that Defendant's justification regarding Plaintiff's failure to return to work did not actually motivate its decision to terminate. For these reasons, Plaintiff's disability discrimination claim related to her depression must be dismissed as a matter of law.

Next, Plaintiff's claim of discrimination related to her vertigo condition is a failure to

accommodate claim related to Defendant allegedly not giving her sufficient time to recover from an attack before forcing her to take FMLA leave for that day's remaining work hours. (Pl.'s Resp. at 10.) The elements of a prima facie case of discrimination for failure to accommodate are:

> (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) *she requested an accommodation*; and (5) the employer failed to provide the necessary accommodation.

*Myers v. Cuyahoga County*, 182 F. App'x 510, 515 (6th Cir. 2006) (emphasis added). Assuming that all other elements of a prima facie case are met, Plaintiff admits that she never notified Defendant's SMAART department[6] that she requested an accommodation for her vertigo.

> Q: Did you ever submit a written request to SMAART at any point in time regarding an accommodation for vertigo?
>
> A: I wasn't aware that my vertigo could be covered under accommodation.
>
> Q: So the answer is no, you never did?
>
> A: Right.

(Harb Dep. at 125.) Plaintiff was aware, however, that SMAART would have been the proper department to contact regarding a request for accommodation, as she requested, and received, an accommodation related to a heart monitor that she had to wear for several days during late June 2004. (*Id.* at 120-21.) For that reason, Plaintiff's

---

[6]SMAART stands for SBC Medical Assistance and Accommodation Resource Team and "is a third party vendor which administers Defendant's disability benefits plan, Workmen (sic) Compensation claims, requests for FMLA time and requests for job accommodations." (Def.'s Mot. at 4 n.2.)

13

requests to her direct supervisors for additional time to wait and see if her vertigo attack would pass were insufficient to provide such notice, as she knew that such requests had to go to SMAART.[7] (Harb Dep. at 110-11). Therefore, Plaintiff has failed to state a prima facie case of disability discrimination for failure to accommodate her vertigo condition.

### 3. Plaintiff's disability retaliation claim fails as a matter of law

Plaintiff's retaliation claim arises out of her May 13, 2004 complaint to the MDCR regarding Defendant's alleged discrimination as a result of Plaintiff's disabilities. In her deposition, Plaintiff stated that the basis of the retaliation claim is how her supervisors forced her to use FMLA leave following a vertigo attack and the fact that supervisors treated her differently after filing the state civil rights complaint, as they were "more rude" and no longer responded by saying good morning when Plaintiff greeted them. (Harb Dep. at 144-45.)

Defendant's actions regarding FMLA leave cannot form the basis for a retaliation claim, however, because Plaintiff admits that filing the MDCR complaint did not change how she was treated compared to the time period prior to taking this action:

> Q: After you filed [your complaint] was there anything that they did that you thought was done in retaliation or to get back at you for filing [your complaint]?
>
> A: Again, I was forced to use FMLA at times when I just needed a few moments [to recover from a vertigo attack].

---

[7]It is true that one of Plaintiff's physicians made several requests during her medical leave that she be transferred out of the CCC department. (Pl.'s Resp., Exs. 16, 20, 24.) These requests were related to her depression which had led to the medical leave and did not mention Plaintiff's vertigo, however. Moreover, Plaintiff has not indicated which types of positions would have accommodated her disabilities.

14

> Q: But that was no change from before filing [your complaint]; right?
>
> A: It was just constant.

(Harb Dep. at 144.)  Additionally, an employer or supervisor's personal dislike of an employee does not rise to the level of conduct that supports a retaliation claim.  *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 343 (6th Cir. 1998).  For these reasons, Plaintiff's retaliation claim fails as a matter of law.

### B.  Plaintiff's FMLA Claim

Plaintiff's third claim is based upon Defendant's alleged retaliation in response to Plaintiff exercising her right to take leave under the FMLA.  A plaintiff who brings an FMLA retaliation claim must first state a valid prima facie case, which requires (1) that the individual engaged in a statutorily protected activity, (2) suffered an adverse employment action, and (3) a causal relationship existed between the two events.  *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314 (6th Cir. 2001).  As with Plaintiff's ADA discrimination claim, the *McDonnell Douglas* burden-shifting analysis applies to this claim as well.  *Id.* at 315.

Defendant disputes that Plaintiff has stated a prima facie case of FMLA retaliation because (1) she was not engaged in a protected activity at the time of her termination due to the fact that her twelve weeks of FMLA leave had already expired, and (2) she has not demonstrated a sufficient causal connection.  Here, Plaintiff's only stated connection between her exercise of FMLA leave and her termination is temporal proximity, which is insufficient to meet that element of a prima facie case.[8]  *Skrjanc*, 272

---

[8]Although not cited in connection with her FMLA claim, the Court did consider the alleged evidence of Defendant's failure to follow its own policies in terminating Plaintiff

F.3d at 317.

## IV.  CONCLUSION

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders that Defendant's motion for summary judgment is GRANTED and this case is DISMISSED.

SO ORDERED.


                                s/Nancy G. Edmunds
                                Nancy G. Edmunds
                                United States District Judge

Dated:  May 29, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 29, 2007, by electronic and/or ordinary mail.

                                s/Carol A. Hemeyer
                                Case Manager

---

that she raises with regards to her ADA and MDCRA claims to argue that Defendant's asserted justification is pretext. (Pl.'s Resp. at 9-10.) As noted above, however, Plaintiff has failed to show that this indicates that Defendant's justification was mere pretext for unlawful retaliation. Thus, even if Plaintiff properly pled the causation element of her FMLA retaliation claim, she is unable to meet her shifted burden of production under *McDonnell Douglas*.